# In the United States Court of Federal Claims

| | |
|---|---|
| BRENDA BAUGHMAN,<br><br>Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | No. 18-vv-0591<br>(Filed Under Seal: September 8, 2026<br>Reissued for Publication: September 25, 2026)[1] |

*Mark Theodore Sadaka*, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for Petitioner.

*Lauren Kells*, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for Respondent. Also on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Jonathan D. Guynn*, Acting Director, *Heather L. Pearlman*, Deputy Director, and *Julia M. Collison*, Assistant Director.

**OPINION AND ORDER**

Meriweather, Judge.

Petitioner, Ms. Brenda Baughman ("Ms. Baughman"), seeks review of Special Master Horner's Entitlement Decision ("Decision"), denying her entitlement to compensation pursuant to the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1–aa-34 ("Vaccine Act"). *See* Decision at 1, ECF No. 99. Ms. Baughman filed a Petition under the Vaccine Program of the Vaccine Act, alleging she suffered vaccine-induced polyneuropathy—a condition in which the core fibers (axons) of multiple peripheral nerves are damaged. *See* Petition at 1–3, ECF No. 1. The Special Master determined that Ms. Baughman failed to prove causation-in-fact because she could not establish, by a preponderance of the evidence, "that the Tdap vaccine can cause autoimmune axonal polyneuropathy" and that her "own polyneuropathy is autoimmune." Decision at 29, 31. He therefore denied her Petition. *Id*. at 33.

Ms. Baughman now seeks review of the Special Master's Decision in this Court, alleging he unduly raised the burden of proof, made other errors of law, and irrationally weighed the evidence. *See* Pet'r's Mot. for Review ("Mot."), ECF No. 100; *see also* 42 U.S.C. § 300aa-12(e)(1). Respondent, the Secretary of Health and Human Services ("the Secretary"), counters

[1] Pursuant to Vaccine Rule 18(b)(1)–(2), (d), this Opinion was initially filed under seal on September 8, 2026, and the parties were afforded fourteen days to propose redactions. The parties did not propose any redactions and, accordingly, this Opinion is reissued in its original form for publication.

that Ms. Baughman has not shown that the Special Master's Decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* Resp't's Resp. to Mot. for Review ("Resp.") at 1, ECF No. 102. Having reviewed the record, the parties' legal filings,[2] and the relevant law, the Court **DENIES** Ms. Baughman's Motion for Review and **SUSTAINS** the Special Master's Decision. The Special Master did not commit an error of law or arbitrarily or capriciously weigh the evidence when he determined that Ms. Baughman failed to carry her burden of proof.

## BACKGROUND

### I. Legal Framework

The Vaccine Act, enacted in 1986, created the National Vaccine Injury Compensation Program, through which claimants can petition to receive compensation for vaccine-related injuries or death. *See generally* 42 U.S.C. § 300aa-10(a). The Act identifies two ways for a petitioner to establish causation and thus qualify for compensation. First, a petitioner may establish that she, after receiving a designated vaccine, suffered an injury listed on the Vaccine Injury Table within the requisite time-period—commonly called a "Table Injury," *see* 42 C.F.R. § 100.3(a)—in which case causation is presumed, *see* 42 U.S.C. § 300aa-11(c)(1). Alternatively, where—as here—a petitioner claims entitlement for an injury *not* listed on the Vaccine Injury Table, *i.e.*, an "Off-Table case," the petitioner must instead prove that the vaccination was the cause-in-fact ("actual causation" or "causation-in-fact") of the vaccinee's asserted injury. *See id.* § 300aa-11(c)(1)(C)(ii)(I), (II). To prove causation-in-fact for an Off-Table case, a petitioner must by a preponderance of the evidence demonstrate: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). Those three elements are commonly referred to as the "*Althen* prongs." *See, e.g., Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, 166 F.4th 1318, 1320 (Fed. Cir. 2026); *White v. Sec'y of Health & Hum. Servs.*, 163 F.4th 1356, 1363 (Fed. Cir. 2025); *Trollinger v. Sec'y of Health & Hum. Servs.*, 167 Fed. Cl. 127, 133 (2023).

"When applying *Althen*, the special master must consider the degree to which each factor is satisfied." *Cerrone v. Sec'y of Health & Hum*. Servs., 146 F.4th 1113, 1122 (Fed. Cir. 2025). However, a petitioner's "failure to establish any one prong is dispositive." *Exum v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 681, 702 (2025); *see also Olsen v. Sec'y of Health & Hum. Servs.*, 758 Fed. App'x 919, 925 n.8 (Fed. Cir. 2018) (affirming a Special Master's finding that a petitioner failed to establish *Althen* prong one and thus determining the Court "need not address the Special Master's findings with respect [to] the remaining two *Althen* prongs").

---

[2] The following filings are relevant to this Opinion: Petition, ECF No. 1; Mot., ECF No. 100; Resp., ECF No. 102. Throughout, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

## II. Factual Background

The Special Master summarized and evaluated Ms. Baughman's medical history during the relevant period, both parties' expert reports, the medical literature submitted, the medical theory of causation asserted by Ms. Baughman, and the relevant legal standards. *See generally* Decision. This Opinion will briefly summarize the relevant undisputed facts, the expert reports, and the Special Master's determinations, focusing on the facts and reports relevant to the first *Althen* prong.

### A. Ms. Baughman's Medical History

Ms. Baughman had a prior medical history of osteoporosis and hyperlipidemia at the time of vaccination, regularly saw her physician for preventative care, and had been seeing a chiropractor for pain in various areas. *See* Decision at 4–5. On May 2, 2016, a urinalysis "showed trace amounts of blood, elevated white blood cells and bacteria, and the presence of leukocyte esterase and nitrites." *Id.* at 5 (citing Ex. 2 at 50–51, ECF No. 7-2). Ms. Baughman had a follow-up appointment on May 10, 2016, and received the pneumococcal ("Prevnar 13") and tetanus, diphtheria, and acellular pertussis ("Tdap") vaccines during this appointment. *Id.* Ms. Baughman experienced worsening pain over the next several months, including numbness and tingling in her extremities. *Id.* at 5–7. On July 1, 2016, Ms. Baughman underwent an electromyography and a nerve conduction study ("EMG/NCS"). *Id.* at 8. Based on the study's results, Dr. Paulo Cancado, who performed the EMG/NCS, diagnosed Ms. Baughman with "axonal sensory and an axonal and demyelinating motor polyneuropathy." *Id.* (citing Ex. 1 at 1, ECF No. 7-1).

Ms. Baughman underwent a neuromuscular evaluation on September 21, 2016. *Id.* at 10 (citing Ex. 3 at 12, ECF No. 7-3). The results noted that she developed "back pain and tingling in her toes and finger tips as well as a diffuse rash of 'red dots' across her abdomen" within ten days of her Tdap and Prevnar 13 vaccinations. *Id.* The treating physician, Dr. Carlson, noted that Ms. Baughman suffered from "[a]cute onset distal [asymmetric] non-length dependent polyneuropathy" and that the "most likely etiology is an acute autoimmune neuropathy associated with tetanus vaccination." *Id.* (alterations in original) (citing Ex. 3 at 14). He noted that "post-vaccinal neuropathies can develop often related to a leukocytoclastic vasculitis," and that Ms. Baughman "had a truncal rash associated with peripheral nerve symptomatology early in her presentation which is likely a dermatologic comorbid condition." *Id.* Over the next several years, Ms. Baughman continued to seek treatment. *Id.* at 10–13. Her condition somewhat improved. *Id.* In October 2024, at the entitlement hearing, Ms. Baughman testified that she continues to suffer from "cramps and pain in [her] feet and ankles" and has other lifestyle impairments. *Id.* at 13 (alteration in original) (citing Ex. 11 ¶ 37, ECF No. 7-11).

### B. Procedural History

On April 25, 2018, Ms. Baughman filed her Petition against the Secretary, alleging she suffered vaccine-induced polyneuropathy. Petition at 1. After the parties submitted medical records, medical literature, and medical expert reports, the Special Master held an entitlement hearing in October 2024. *See* Transcript of Proceedings ("Tr."), ECF Nos. 91–92. After the

hearing, the Special Master entered two scientific reports from the Institute of Medicine ("IOM") on adverse events associated with vaccines, one from 1994 and another from 2012, into the record as Court Exhibits, noting that both parties' medical literature referenced the publications. *See* Court Ex. I, ECF No. 87-1; Court Ex. II, ECF No. 87-2. The Special Master gave the parties an opportunity to supplement the record with a response, but both parties confirmed that they did not wish to do so. *See* Decision at 4. The Special Master denied Ms. Baughman's Petition on March 17, 2026. *Id.* at 1.

### C. Expert Opinions and Medical Literature

#### 1. Ms. Baughman's Expert Dr. Alberto A. Martinez-Arizala

Dr. Alberto A. Martinez-Arizala, a neurologist, provided three export reports and testified in support of Ms. Baughman at the entitlement hearing. *Id.* at 13. Dr. Martinez-Arizala opined that "[Ms. Baughman]'s neuropathy, the onset of which began about two weeks post-vaccination, can be associated with her tetanus vaccination." *Id*. at 14 (citing Ex. 16 at 5, 7, ECF No. 38-1; Tr. at 55, 71–72, 83–84). He also asserted that his opinion "is consistent with the opinion of the treating physician, Dr. Carlson." *Id*.

Dr. Martinez-Arizala posited that "where components of the vaccine possess sequence similarities between it and specific human proteins that results in the cross-activation of autoreactive T or B cells." *Id.* (citing Ex. 16 at 5). He explained that such cross-reactivity "causes a reaction of the immune system against the pathogenic antigens that may harm the similar human proteins, essentially causing autoimmune disease." *Id.* (citing Ex. 16 at 5). Dr. Martinez-Arizala specifically cited the increase in Guillain-Barré Syndrome ("GBS")—another neurological disorder—following swine flu vaccination "as an example of autoimmune peripheral neuropathy related to vaccination, where there is also additional evidence that molecular mimicry was the link between the disease and vaccination." *Id.* at 16 (citing Ex. 16 at 6; Ex. 18, ECF No. 39-1; Ex. 21, ECF No. 39-4).

#### 2. The Secretary's Experts

##### *i. Dr. Peter D. Donofrio*

Dr. Peter D. Donofrio, an expert in nerve and muscular disorders and electrodiagnostic medicine, provided three expert reports and testified in support of the Secretary at the entitlement hearing. *Id*. at 17. Dr. Donofrio opined that Ms. Baughman's "expert did not discuss a medical theory as to how the Tdap vaccine or the Prevnar vaccine or the combination of the two caused her polyneuropathy." *Id*. at 19 (citing Ex. A at 9, ECF No. 42-1). Dr. Donofrio also observed that Ms. Baughman's expert had offered "medical literature on the association between the tetanus vaccine and GBS, and a single case report of radial nerve palsy and brachial plexopathy after tetanus vaccination," but concluded that Ms. Baughman had "not been diagnosed with GBS." *Id*. Dr. Donofrio also stated that the 2012 IOM report "does not have a section on tetanus vaccination and peripheral neuropathy." *Id.*

### *ii. Dr. Penelope Morel*

Dr. Penelope Morel, an immunologist, also submitted three expert reports and testified in support of the Secretary at the entitlement hearing. *Id.* at 19–20. Dr. Morel noted that "several polyneuropathies have an immune etiology" and "such conditions are well defined," but Ms. Baughman "has not been diagnosed with any of them." *Id.* at 20 (noting some association between immune cells and the conditions GBS, Multiple Sclerosis ("MS"), and Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP"), none of which Ms. Baughman reported as a diagnosis) (citing Ex. C at 3, ECF No. 43-1; Tr. at 169–71). Dr. Morel also "acknowledged that there are case reports linking the GBS to vaccination," but she "opined that only a causal relationship with the flu vaccine has been documented" and that at least one "large study found no association between GBS and the tetanus vaccine." *Id.* at 22 (citing Ex. C at 4; Ex. F at 2, ECF No. 50-2). Dr. Morel further noted that "case reports suggesting that GBS or CIDP followed tetanus vaccination" were either from before 1985 or involved multiple vaccinations. *Id.* (citing Ex. 24, ECF No. 39-7; Ex. 25, ECF No. 39-8; Ex. 26, ECF No. 39-9; Ex. 27, ECF No. 39-10).

Regarding the theory of molecular mimicry, Dr. Morel stated it "has been around for a long time as a way to explain how infections may precipitate autoimmune diseases" but has been difficult to prove. *Id.* (citing Ex. C at 5). Dr. Mortel stressed that "[t]emporal association with vaccination does not prove that a vaccine caused a condition; evidence substantiating that an immune process is responsible for the disease should also be present;" he opined that Ms. Baughman failed to provide substantiating evidence. *Id.*

## **D. The Special Master's Conclusions**

The Special Master noted that Ms. Baughman "contends that she suffered an autoimmune axonal polyneuropathy caused by her vaccination." *Id.* at 23. The Special Master summarized Ms. Baughman's medical theory of causation under *Althen* prong one as "a general causation opinion based on the concept of molecular mimicry." *Id.* The Special Master acknowledged Ms. Baughman's contention that "because molecular mimicry is generally accepted as a mechanism of autoimmunity, most notably in the context of Guillain-Barré Syndrome, and because polyneuropathy can likewise be autoimmune, she has therefore satisfied her preponderant burden of proof." *Id.* The Special Master also considered Ms. Baughman's argument that "she is not obligated to prove either an exact homology or a relevant host antigen to support her invocation of molecular mimicry, and that her only obligation is to present a 'plausible, biologically tenable theory.'" *Id.* Nonetheless, the Special Master concluded that Ms. Baughman failed to carry her burden of proof. *Id.*

The Special Master acknowledged that a "petitioner is not obligated to come forward with a specific biologic mechanism to meet her burden of proof." *Id.* (citing *Kottenstette v. Sec'y of Health & Human Servs.*, 861 F. App'x 433, 440–41 (Fed. Cir. 2021)). The Special Master noted that Ms. Baughman sought "to meet her burden of proof under *Althen* prong one at least in part via presentation of such a mechanism – in this case, molecular mimicry." *Id.* The Special Master then explained that "the soundness of that assertion must be assessed." *Id.* at 23–24 (citing *Howard v. Sec'y of Health & Hum. Servs.*, No. 16-1592V, 2022 WL 4869354, at *24

(Fed Cl. Spec. Mstr. Aug. 31, 2022), *mot. for rev. denied*, No. 16-1529, 2023 WL 4117370, (Fed. Cl. May 18, 2023), *aff'd per curiam*, No. 2023-1816, 2024 WL 2873301 (Fed. Cir. June 7, 2024)).

The Special Master noted that "Dr. Martinez-Arizala's theory of how vaccines cause autoimmune disorders is based on molecular mimicry." *Id*. at 16 (citing Ex. 16 at 5). The Special Master reviewed that medical theory of causation and determined that it failed to provide "any demonstration of either homology or a host antigen" or any other evidence "that suggests that the Tdap vaccine can cause axonal polyneuropathy via molecular mimicry." *Id*. at 24–25. The Special Master observed that "Dr. Martinez-Arizala conceded during the hearing that he has neither proposed a homology that would support molecular mimicry nor identified a component of the vaccine that would cross-react within the body." *Id*. at 25 (citing Tr. at 103–04). The Special Master recognized that circumstantial evidence is permissible in vaccine cases and relevant in this case. *Id.* (citing *Althen*, 418 F.3d at 1280). Nonetheless, the Special Master was unpersuaded by Dr. Martinez-Arizala's reliance on circumstantial evidence linking the tetanus and flu vaccines to other neurological conditions, including GBS. *Id.* The Special Master noted that "Dr. Martinez-Arizala acknowledged that [Ms. Baughman]'s own condition is not directly analogous to GBS" and that the Secretary's expert "Dr. Morel reasonably explained, those peripheral neuropathies that are considered immune-mediated tend to be well-defined and have identified immune processes." *Id*. (citing Tr. at 58–59, 170–71; Ex. 29 at 3, ECF No. 47-1). The Special Master concluded that Dr. Martinez-Arizala's medical opinion and citations did "nothing to implicate the specific components of the Tdap vaccine as potential molecular mimics" and did not "demonstrate that the Tdap vaccine (or [] any component of the vaccine) elicits the anti-ganglioside antibodies underlying [Ms. Baughman]'s theory." *Id.* at 26.

The Special Master was unpersuaded by Dr. Martinez-Arizala's citations to "a series of case reports generally seeking to implicate tetanus vaccines in the manifestation of various neuropathies." *Id*. at 27. The Special Master found that "none of the publications provide any useful data beyond a purported temporal association" and that "none of the four [non-GBS-focused] publications [Ms. Baughman] presented regarding case reports of post tetanus-vaccination neuropathies even invoke molecular mimicry generally." *Id*. The Special Master recounted that "Dr. Martinez-Arizala himself conceded that case reports at best 'suggest' a potential causal link." *Id*. (citing Tr. at 94).

The Special Master observed that Dr. Martinez-Arizala relied on "literature specifically implicating structures in the flu vaccine with the induction of antiganglioside antibodies"—immune proteins that mistakenly attack gangliosides (complex molecules in the nervous system)—and "literature that in turn associates anti-ganglioside antibodies with the axonal variant of GBS." *Id*. at 26 (citing Ex. 53, ECF No. 64-11; Ex. 54, ECF No. 64-12). With respect to his theory linking the Tdap vaccine to neurological disorders, the Special Master noted that Dr. Martinez-Arizala cited several case reports "of peripheral neuropathies related to the administration of the tetanus vaccine." *Id*. (citing Ex. 16 at 6).[3]

[3] Although Ms. Baughman's Petition also notes that she received the Prevnar 13 vaccine on May 10, 2016, *see* Petition at 1, she did not offer any expert reports, literature, or testimony claiming that the Prevnar 13 vaccine can cause the axonal neuropathy that she suffered.

The Special Master also acknowledged Dr. Martinez-Arizala's attempts "to bolster [Ms. Baughman]'s theory by discussing several articles pertaining to the validity of molecular mimicry as a concept and the degree of homology that can support its invocation." *Id.* at 29. (citing Tr. at 239–42; Ex. 74, ECF No. 86-1; Ex. 75, ECF No. 86-2; Ex. 76, ECF No. 86-3). The Special Master explained that "the issue here is not the general viability of molecular mimicry, it is whether it is reasonably applied to this combination of vaccination and injury" and that "parsing the degree of homology that could support molecular mimicry is essentially irrelevant where there has been no presentation of a proposed homology in the first place." *Id*. Thus, "considering the record as a whole," the Special Master concluded that Ms. Baughman "has not preponderantly demonstrated that the Tdap vaccine can cause autoimmune axonal polyneuropathy." *Id.*

After determining that Ms. Baughman failed to carry her burden of proof under the first *Althen* prong, the Special Master also considered whether Ms. Baughman satisfied the second and third *Althen* prongs. *Id*. at 29–33; *see also Cerrone*, 146 F.4th at 1122. He "note[d] out of an abundance of caution that the evidence relevant to *Althen* prong two is not so robust as to otherwise influence the analysis under *Althen* prong one." Decision at 29. The Special Master determined that "[t]he only affirmative clinical evidence Dr. Martinez-Arizala cited to support an autoimmune process was petitioner's rash," highlighting that even "Dr. Martinez-Arizala ultimately conceded of the rash that it 'could have been anything.'" *Id*. at 32 (citing Tr. at 63, 71–72, 252; Ex. 1 at 83). After weighing the evidence, the Special Master concluded that "the evidence does not preponderate in favor of a finding that [Ms. Baughman]'s own polyneuropathy is autoimmune." *Id*. at 31. As to the third *Althen* prong, the Special Master stated that "there is no apparent dispute that [Ms. Baughman]'s neuropathy arose about two-weeks post-vaccination" and that the Secretary "contests that [Ms. Baughman] has met her burden of proof under *Althen* prong three . . . only to the extent she has not met her burden under *Althen* prong one." *Id.* at 30. The Special Master explained that "temporal association alone is not enough to satisfy [Ms. Baughman]'s burden of proof." *Id.*

The Special Master ultimately denied Ms. Baughman's Petition for compensation. *Id*. at 33. Ms. Baughman timely filed a Motion for Review on April 10, 2026. The Secretary filed a response on May 11, 2026. This case is now ripe for review.

## STANDARD OF REVIEW

"Under the Vaccine Act, the Court of Federal Claims reviews the decision of the special master to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1350 (Fed. Cir. 2008) (quoting 42 U.S.C. § 300aa-12(e)(2)(B) and citing *Althen*, 418 F.3d at 1277). In Vaccine Act cases, this Court uses three distinct standards of review—factual findings are reviewed under the "arbitrary and capricious" standard; legal conclusions are reviewed under the "not in accordance with law" standard; and discretionary rulings are reviewed under the "abuse of discretion" standard. *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

This Court reviews de novo whether a special master acted "not in accordance with law." *Althen*, 418 F.3d at 1279. "'Not in accordance with the law' refers to the application of the wrong legal standard." *Rodriguez v. Sec'y of Health & Hum. Servs*., 632 F.3d 1381, 1384 (Fed. Cir. 2011). The Court owes "no deference to the . . . special master on questions of law." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1345 (Fed. Cir. 2010).

The standard of review for factual findings is "the most deferential possible." *Munn*, 970 F.2d at 870. The U.S. Court of Appeals for the Federal Circuit has warned against "second guess[ing] the Special Master[']s fact-intensive conclusions," particularly in those cases "in which the medical evidence of causation is in dispute." *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (describing the standard of review as "uniquely deferential for what is essentially a judicial process"). This Court cannot "substitute its judgment for that of the special master merely because it might have reached a different conclusion." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009). Further, a "special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen*, 618 F.3d at 1347. These credibility findings "are virtually unchallengeable on appeal." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1362 (2000).

A special master does not need to "discuss every item of evidence in the record" when making a factual finding "so long as the decision makes clear that the special master fully considered a party's position and arguments on point." *Snyder v. Sec'y of Health & Hum. Servs*., 36 Fed. Cl. 461, 466 (1996), *aff'd*, 117 F.3d 545 (Fed. Cir. 1997); *see also Hazlehurst v. Sec'y of Health & Hum. Servs*., 604 F.3d 1343, 1352 (Fed. Cir. 2010) (noting the Court should presume the special master has considered all the material in the record, regardless of whether she mentions it all). This Court does not "reweigh the factual evidence, . . . assess whether the special master correctly evaluated the evidence[,] . . . [or] examine the probative value of the evidence or the credibility of the witnesses." *Munn*, 970 F.2d at 871.

"If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines ex rel. Sevier v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). Accordingly, this Court should not deem a special master's factual conclusions arbitrary and capricious unless they are "so implausible that [they] could not be ascribed to a difference in view." *Id.* at 1527 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutal Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). Indeed, if a special master's "conclusion was based on evidence in the record that is not wholly implausible," this Court must "uphold that finding as not being arbitrary or capricious." *Lampe*, 219 F.3d at 1363.

**DISCUSSION**

Ms. Baughman challenges the Special Master's conclusion that she failed to satisfy the first *Althen* prong. *See* Mot. at 1. *Althen* prong one focuses on general causation and requires that petitioners provide a "reputable medical theory," showing that the subject vaccine can "cause the type of injury alleged." *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355–56 (Fed. Cir. 2006). This medical theory must be "legally probable, not medically or

scientifically certain." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994). Nonetheless, a petitioner "must provide a reputable medical or scientific explanation" for the theory proffered. *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (quotation and quotation marks omitted). "[S]imply identifying a 'plausible' theory of causation" does not meet petitioners' burden of proof. *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014).

Specifically, Ms. Baughman contends that the Special Master unduly raised the burden of proof and irrationally weighed the evidence. Mot. at 1. As discussed below, the Court has considered these claims and sustains the Special Master's finding that Ms. Baughman failed to meet her burden of proof to provide a "reputable medical theory" showing that the Tdap vaccine can cause axonal neuropathy under *Althen* prong one. *See Pafford*, 451 F.3d at 1355–56. It is therefore unnecessary to reach the parties' dispute about the Special Master's findings under the second *Althen* prong.[4] *See Olsen*, 758 Fed. App'x at 925 n.8.

## I. The Special Master Applied the Appropriate Legal Standard When Assessing the Medical Theory that Ms. Baughman Presented.

Ms. Baughman asserts that the Special Master committed an error of law because he raised her burden of proof under the first *Althen* prong by "impos[ing] too exacting a burden." Mot. at 1–2. Specifically, Ms. Baugham contends she was not required to "identify a precise antigenic sequence, exact host antigen, or fully mapped biochemical pathway." *Id.* at 2 (citing *Knudsen*, 35 F.3d at 549; *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325–26 (Fed. Cir. 2006)). Rather, Ms. Baughman argues that she was only required to present "a sound and reliable medical theory causally connecting the vaccine and the injury." *Id.* at 2. She summarizes her causation theory, which she describes as a "differential diagnosis methodology," as follows: "[Ms. Baughman] had no prior neurological illness, her timing was 'perfect' at two weeks, the workup excluded known causes of peripheral neuropathy, and when those facts are tied together with molecular mimicry, 'that's the smoking gun.'" *Id.* at 3 (citing Tr. at 63, 249). The Secretary counters that the Special Master did not require "a specific biologic mechanism" but instead applied the proper preponderance of the evidence standard when assessing the medical causation theory that Ms. Baughman put forth regarding her injury. Resp. at 9 (citing *Broekelschen*, 618 F.3d at 1345).

The Special Master did not, as Ms. Baughman claims, require her to provide proof of any specific biological mechanism to satisfy the first *Althen* prong. In an Off-Table vaccine case, "it is the petitioner's burden to prove actual causation by a preponderance of the evidence" and to "provide a 'reputable medical or scientific explanation' for [the petitioner's] theory." *Boatmon*, 941 F.3d at 1359 (quoting *Moberly*, 592 F.3d at 1322). The petitioner's theory "must be supported by a sound and reliable medical or scientific explanation" but "detailed medical and

[4] If a petitioner does not meet her burden to show by a preponderance of the evidence that the vaccine can cause the condition suffered under the first *Althen* prong, the petitioner necessarily cannot show that the vaccine caused her injury in the specific case under the second *Althen* prong or a causal temporal relationship under the third *Althen* prong. *See Olsen*, 758 Fed. App'x at 925 n.8.

scientific exposition on the biological mechanisms" is not required. *Simanski v. Sec'y of Health & Hum. Servs.*, 671 F.3d 1368, 1384 (Fed. Cir. 2012) (quoting *Knudsen*, 35 F.3d at 548–49); *see generally Moberly*, 592 F.3d at 1324 (noting that special masters are "entitled to require some indicia of reliability to support the assertion of [an] expert witness" in a medical opinion"). "[P]etitioners are never required to establish [a] mechanism—but they often attempt to do so, and therefore it is reasonable to evaluate their success in the effort." *Howard*, 2022 WL 4869354, at *24. Here, the Special Master recognized that Ms. Baughman was not "obligated to come forward with a specific biologic mechanism." Decision at 23 (citing *Kottenstette*, 861 Fed. App'x at 440–41). Nevertheless, because Ms. Baughman based her causation theory on Dr. Martinez-Arizala's assertions about molecular mimicry, the Special Master was required to assess whether those assertions were "sound and reliable." Decision at 23–24.

Nor was it legal error, as Ms. Baughman claims, *see* Mot. at 2, for the Special Master to consider whether Dr. Martinez-Arizala provided a reliable theory of how molecular mimicry applies to the specific vaccine and injury combination in this case. The Federal Circuit explained in *Cerrone* that when a petitioner has "identified a specific biological mechanism connecting his vaccination to his injury—molecular mimicry" under the first *Althen* prong, a special master must determine whether the evidence "*preponderantly establish[es] that the vaccine(s) at issue more likely than not can cause the relevant disease*." 146 F.4th at 1121–22 (emphasis in original). Thus, the Special Master correctly differentiated evidence of the "general viability of molecular mimicry" from evidence to support the theory that molecular mimicry can cause the "combination of vaccination and injury" in Ms. Baughman's case. *See* Decision at 29. The Special Master also appropriately assessed whether there was sufficient evidentiary support for Dr. Martinez-Arizala's assertion that the Tdap vaccine can cause axonal polyneuropathy to satisfy Ms. Baughman's preponderant burden of proof. *See id*. at 27–29.

Ms. Baughman correctly notes that a petitioner may meet her burden of proof through circumstantial evidence. *See Althen*, 418 F.3d at 1280. But the Special Master did not run afoul of this legal standard. *See* Mot. at 7. It is not necessarily enough that a petitioner has "identified circumstantial evidence to support [their] causal theory." *Cerrone*, 146 F.4th at 1121. A special master must still weigh that evidence against competing evidence to evaluate the proposed causal link between the vaccine and the specific injury. *Id*. at 1122. The Special Master correctly noted that Ms. Baughman could rely on circumstantial evidence of molecular mimicry, *see* Decision at 25 (citing *Althen*, 418 F.3d at 1280), and weighed whether this circumstantial evidence preponderantly demonstrated that the Tdap vaccine could cause autoimmune axonal polyneuropathy. *Id*. at 25–29.

Ms. Baughman further claims that the Special Master raised the burden of proof when he discounted "evidence linking tetanus-containing vaccines to immune-mediated peripheral nerve injur[ies]" such as GBS. Mot. at 7. Ms. Baughman argues that evidence "supports the *plausibility* of a related immune-mediated neuropathic process" in her case. *Id.* (emphasis added). But the Federal Circuit has "repeatedly stated that 'simply identifying a "plausible" theory of causation is insufficient for a petitioner to meet her burden of proof." *Cerrone*, 146 F.4th at 1121 (quoting *LaLonde*, 746 F.3d at 1339). Thus, the Special Master appropriately required more than a plausible causal link and rejected Ms. Baughman's arguments to the contrary. *See* Decision at 23, 25.

Ms. Baughman's argument that the Special Master made an error of law because he failed to consider Dr. Martinez-Arizala's "differential diagnosis methodology" is similarly unconvincing. Ms. Baughman herself notes that Dr. Martinez-Arizala's causation opinion relied on circumstantial evidence "tied together with molecular mimicry." Mot. at 3. Hence, it follows that the Special Master was required to apply the preponderance of evidence standard to Ms. Baughman's causal theory linking the Tdap vaccine to her injury via molecular mimicry. The Special Master did just that, including considering whether any circumstantial evidence of the temporal connection and her specific symptoms under *Althen* prong two was "so robust as to otherwise influence the analysis under *Althen* prong one." Decision at 31. The Special Master weighed the totality of the evidence to determine whether Ms. Baughman's theory of causation was adequate to meet her preponderant burden of proof under *Althen* prong one. *See Cerrone*, 146 F.4th at 1121–22. Thus, the Special Master applied the proper legal standard.

## II. The Special Master Properly Weighed the Evidence and Made Factual Determinations Under the First *Althen* Prong.

Ms. Baughman further contends that the Special Master improperly weighed the record evidence and hearing testimony when assessing Ms. Baughman's theory under the first *Althen* prong. Mot. at 4–8. The Secretary argues that Ms. Baughman's contentions amount to mere disagreement with the Special Master's reasoned weighing of the evidence, which is not a proper basis for reversal. Resp. at 11. "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d at 1528.

Ms. Baughman more specifically argues that the Special Master "understated" the medical opinion that Dr. Martinez-Arizala provided on general causation by concluding that Dr. Martinez-Arizalainitially treated the issue "very lightly" and only belatedly bolstered his opinion "through rebuttal testimony." Mot. at 4–5. But the Special Master thoroughly reviewed Dr. Martinez-Arizala's theory of causation regarding the Tdap vaccine and axonal polyneuropathy, including his expert reports and his testimony at the hearing. *See* Decision at 25–29. The Special Master noted that "Dr. Martinez-Arizala conceded during the hearing that he has neither proposed a homology that would support molecular mimicry nor identified a component of the vaccine that would cross-react within the body." *Id.* at 25 (citing Tr. at 103–04). The Special Master was unconvinced by Dr. Martinez-Arizala's citations to circumstantial evidence linking flu and tetanus vaccines with GBS via molecular mimicry, in particular because Dr. Martinez-Arizala acknowledged GBS is a neurological condition that "is not directly analogous" to Ms. Baughman's condition. *Id.* (citing Tr. at 58–59, Ex. 16 at 5–6, Ex. 29 at 3). And the Special Master determined that "mere analogy to GBS is not enough to support invocation of molecular mimicry vis-à-vis other types of peripheral neuropathy." *Id.* These findings were rational and based on relevant evidence in the record. *See Hines*, 940 F.2d at 1528.

Further, the Special Master reasonably noted that none of the literature Dr. Martinez-Arizala cited "demonstrate[s] that the Tdap vaccine (or an any component of the vaccine) elicits the anti-ganglioside antibodies underlying [Ms. Baughman's] theory" that vaccines can cause axonal polyneuropathy. Decision at 26. The Special Master also reviewed the literature Dr. Martinez-Arizla cited on rebuttal but determined that the studies only addressed "the validity of

molecular mimicry as a concept and the degree of homology that can support its invocation," which the Special Master appropriately determined did nothing to answer the specific question of whether Tdap can cause axonal polyneuropathy via molecular mimicry. *Id.* at 29. This Court cannot "second guess the Special Master[']s fact-intensive conclusions," particularly since "the medical evidence of causation is in dispute." *Hodges*, 9 F.3d at 961.

The Special Master also found Dr. Morel's explanation that "peripheral neuropathies that are considered immune-mediated tend to be well-defined and have identified immune processes" to be more reasonable than Dr. Martinez-Arizala's opinion. Decision at 25 (citing Tr. at 170–71).[5] The Special Master was permitted to base his Decision "on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen*, 618 F.3d at 1347. Those credibility determinations "are virtually unchallengeable on appeal." *Lampe*, 219 F.3d at 1362.

Ms. Baughman further contends that the Special Master inappropriately weighed the case reports that Dr. Martinez-Arizala provided, which implicated tetanus vaccines in the manifestation of various neuropathies. Mot. at 4. Again, the Special Master did not err. The Special Master did not discount the case reports out of hand. Rather, he considered whether the case reports collectively were sufficient to meet Ms. Baughman's burden of proof. *See* Decision at 27. After reviewing each case report, the Special Master rationally concluded that the case reports were "not uniform in either clinical presentation or proposed theory of causation (where a theory is even presented) . . . [and] none of the publications provide any useful data beyond a purported temporal association." *Id.* This Court has recognized that case reports "do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value." *Paluck ex rel. Paluck v. Sec'y of Health & Human Servs*., 104 Fed. Cl. 457, 475 (2012) (quoting *Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650, 668 (2011)). The Special Master even highlighted that Dr. Martinez-Arizala himself "conceded that case reports at best 'suggest' a potential causal link." Decision at 27 (citing Tr. at 94). As noted above, a "plausible" causal link does not meet the statutory standard in vaccine cases. *Cerrone*, 146 F.4th at 1121. The Special Master's weighing of the case reports was rational.

Finally, Ms. Baughman posits that the Special Master gave insufficient weight to treating physician Dr. Carlson's opinion that Ms. Baughman's injury was vaccine-induced. Mot. at 8. The opinion of a treating physician is relevant evidence under first *Althen* prong. *Patton v. Sec'y*

---

[5] Ms. Baughman argues that the Special Master minimized an overstatement by Dr. Morel about the lack of evidence linking the Tdap vaccine and GBS, which Ms. Baughman contends highlights the Special Master's irrational treatment of the evidence. Mot. at 7. While the Special Master did disagree with Dr. Morel's characterization of some evidence, he clearly explained that Ms. Baughman's "case does not fail under *Althen* prong one because respondent's experts disagree" and rather failed because Ms. Baughman "failed to come forward with evidence to support her proffered theory by a preponderance of the evidence." Decision at 28. The Special Master did not need to agree with every opinion that Dr. Morel offered to find her medical opinion reasonable in other respects. As the factfinder, the Special Master was entitled to weigh "the relative persuasiveness of [the experts'] competing theories." *Broekelschen*, 618 F.3d at 1347.

*of Health & Hum. Servs.*, 157 Fed. Cl. 159, 169 (2021) (citing *Capizzano*, 440 F.3d at 1326). However, a diagnosis or statement by a treating physician, just like any other "diagnosis, conclusion, judgment, test result, report, or summary" is "not binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1); *see also Snyder*, 88 Fed. Cl. at 745 n.67 (reasoning "nothing [in a recent Federal Circuit case] mandates that the testimony of a treating physician is sacrosanct"). Here, the Special Master acknowledged that "treating physician opinions [are] relevant to assessing the reliability of the expert's theory of general causation." Decision at 29 (citing *Patton*, 157 Fed. Cl. at 169). But the Special Master weighed the evidence and determined that Dr. Carlson's opinion was a "tentative assessment" and was "premised on the notion that [Ms. Baughman] suffered a leukocytoclastic vasculitis" that led to her rash, which was "not preponderantly established." *Id*. at 32. The Special Master explained that even "Dr. Martinez-Arizala ultimately conceded of the rash that it 'could have been anything.'" *Id*. (citing Tr. at 63, 71–72, 252; Ex. 1 at 83). Accordingly, the Special Master concluded that the evidence was "not so robust as to otherwise influence the analysis under *Althen* prong one." *Id.* at 29. Ms. Baughman clearly disagrees with that conclusion, but this Court cannot second-guess the Special Master's reasoned consideration of the evidence. *See Hines*, 940 F.2d at 1527. The Special Master's assessment of Dr. Carlson's opinion is not "so implausible that it could not be ascribed to a difference in view." *Id.*

In sum, the Special Master's Decision demonstrates that he "considered the relevant evidence of record, dr[ew] plausible inferences[,] and articulated a rational basis" for his conclusions. *Id.* at 1528. Thus, the Court sustains the Special Master's factual findings on general causation.

## CONCLUSION

For the reasons articulated above, Ms. Baughman's Motion for Review, ECF No. 100, is **DENIED** and the Special Master's Decision, ECF No. 99, is **SUSTAINED**. The Clerk of the Court shall enter Judgment for Respondent accordingly.

Date: September 8, 2026

ROBIN M. MERIWEATHER
Judge